UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DANIEL P. NEELON, | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. |
| v. | ) 12-11198-FDS |
| BLAIR KRUEGER AND DESERT EAGLE RESOURCES, LTD., | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS**

This is an action alleging defamation, unfair and deceptive business practices, and tortious interference with prospective economic relationships, all arising out of a business transaction involving mining operations in Mongolia. Plaintiff, Daniel Neelon, a Massachusetts attorney, assisted a client in negotiating a loan agreement with defendants Desert Eagle Resources, Ltd., and its CEO, Blair Krueger. The relationship between the client and the defendants deteriorated shortly thereafter. Plaintiff alleges that defendants purposely published defamatory statements in an effort to pressure his client to take certain actions that would be advantageous to them.

Defendants have moved to dismiss the complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. Rule 12(b)(2), and for insufficient service of process pursuant to Fed. R. Civ. P. Rule 12(b)(5).[1] For the reasons discussed below, the motion to dismiss will be denied.

---

[1] Defendants' initial motion to dismiss also argued that the complaint did not allege that the Court has personal jurisdiction over defendants, and thus failed to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). Because this ground does not appear in defendants' updated memorandum in support of

## I. Background

### A. Factual Background

#### 1. Agreement Between Cohen and Defendants

Daniel Neelon is a licensed attorney in the Commonwealth of Massachusetts. (Compl. ¶ 13). In October 2010, he was employed at the Boston-based firm Denner Pellegrino, LLP. (Compl. ¶ 13). At that time, Neelon was involved in negotiating a loan agreement on behalf of Georges Cohen, a Montreal-based client. (Neelon Dec. ¶ 9).

The specifics of the loan agreement are not material to the present case. In short, the agreement was between Cohen and Garrison Asia, LLC, a Mongolian subsidiary of Garrison International Ltd., a Toronto-based corporation.[2] The loan transaction was intended to fund certain interest obligations of Garrison International, as well as to provide capital to Garrison Asia for mining operations in Mongolia. (Compl. ¶ 16). Neelon's primary negotiating contact was Blair Krueger, President and CEO of Garrison International and Garrison Asia. (Neelon Dec. ¶¶ 13-14). Neelon was present in Massachusetts for most of the negotiations; Krueger was not in Massachusetts at the time, but was aware that Neelon was. (Neelon Dec. ¶¶ 16-17).

The documents prepared in conjunction with the agreement included a note, executed by officers of Garrison International, that provided an explicit remedy of transfer of 100% of

---

their motion, and because the amended complaint clearly alleges the existence of personal jurisdiction, the Court will not consider that ground.

Defendants' supplemental memorandum sets forth the additional ground that plaintiff failed to oppose the motion to dismiss for failure to state a claim. Plaintiff, however, filed an amended complaint in response to defendants' initial motion to dismiss, and has since vigorously opposed defendants' motion. Accordingly, the Court will not dismiss the case on that ground.

[2] Garrison International now goes by the name Desert Eagle Resources, Ltd., and is a named defendant in this action.

Garrison Asia's shares to Cohen in the event of any default that lasted at least 72 hours, as well as a pre-signed share-transfer agreement. (Neelon Dec. ¶¶ 23-24).

Less than two months after the loan documents were executed, Garrison Asia defaulted on its loan agreement. Acting through local counsel in Mongolia, Cohen exercised his right to transfer all of the Garrison Asia shares to himself. (Compl. ¶ 16).

### 2. Defendants Alleged Coercive and Defamatory Conduct

The complaint alleges that as a result of the transfer, defendants engaged in a plan to coerce Cohen to reverse the share transfer. (Compl. ¶ 21). Neelon contends that defendants threatened, harassed, and defamed him in hopes of convincing him to pressure Cohen to return the shares.

The complaint alleges that defendants first made veiled threats about "ugly" things that could happen to Neelon in Mongolia. (Compl. ¶ 24). Defendants then filed a complaint against Neelon and Cohen with the Mongolian Police State Investigation Office. (Compl. ¶ 28). The Mongolian police, however, declined to bring criminal charges. (Compl. ¶ 30-32).

On May 20, 2011, defendants issued a press release through Marketwire.com concerning the share transfer. (Compl. ¶ 33). The press release alleged that two men had taken the company stamp from Garrison Asia's office in Ulaanbaatar, Mongolia, "without the knowledge or permission of any of the Officers or Directors of the Company," and had used it to fraudulently transfer Garrison Asia's stock. (Neelon Dec. Ex. 8; Compl. ¶ 33). It stated that the Mongolian police had conducted an investigation, and had recommended that the case proceed to a criminal trial. It also indicated that "[s]uch trial is pending for those accused of this action." (Compl. ¶ 34). Defendants also allegedly informed a number of people that Neelon and Cohen

were the two men accused of stealing the stamp. (Compl. ¶ 36).

According to the complaint, Neelon and Krueger had a conversation about the allegations in August 2011, during which Krueger acknowledged that Neelon's reputation had been harmed by the press release and statements made by defendants. (Compl. ¶ 42). Around the same time, Krueger sent an e-mail to Jules Brossard, a Quebec-based attorney representing Cohen. (Compl. ¶ 43). The subject of the e-mail was "Regarding Daniel Neelon." (Neelon Dec. Ex. 10). Krueger stated that he was writing with respect to "concerns regarding the behavior of Mr. Daniel Neelon, pursuant to the criminal charges which [Cohen] faces in Mongolia." (Neelon Dec. Ex. 10). It also included questions that were explicitly "for Mr. Neelon," as to whether he was "still practicing law in Mongolia," and whether he was licensed to practice law in Mongolia. (Neelon Dec. Ex. 10). After describing Neelon's involvement in the loan negotiations, Krueger stated that "[o]ur Counsel has advised us to take up this matter with the Massachusetts Bar Association." (Neelon Dec. Ex. 10).[3] He then stated:

> It gets worse. I have been provided information that Mr. Neelon has and/or has attempted to bribe the police in Mongolia to favour the position of your client. This, of course, is a very serious matter indeed and violates the Foreign Corrupt Practices Act in the United States of America. Our Counsel has advised us on this matter and has informed us of the appropriate authorities in the USA with whom to address this matter.

(Neelon Dec. Ex. 10).

Defendants issued a further press release on September 23, 2011, through Marketwire.com and news.investors.com. (Compl. ¶ 56, 58). The release stated:

> The company also wishes to notify its shareholders with an update in regard to its

---

[3] Although it is not clear, defendants may have confused the Massachusetts bar (that is, the entire body of attorneys licensed to practice in the Commonwealth) or the Massachusetts Board of Bar Overseers (the state attorney disciplinary authority) with the Massachusetts Bar Association (a private trade organization).

> News Release of May 20, 2011 concerning its statement of the unauthorized transfer of the Company's subsidiary in Mongolia that occurred in January and February 2011 that a criminal action has been filed in Mongolia against Georges Cohen, a former director of Garrison International, and Daniel Neelon, Counsel of Mr. Cohen, and has been assigned case number 21147156. The criminal action pending against Mr. Cohen and Mr. Neelon was filed under section 236 of the Mongolian Criminal Code which refers to a procedure which has caused substantial damage to a business entity and may be reviewed under Section 148 which is entitled "Appropriation of Property by Fraud" or Section 150 which is entitled "Misappropriation or Embezzlement of Property."

(Compl. ¶ 59). The press release referred to the Mongolian police's alleged role in taking possession of assets that were "taken by Cohen and Neelon." (Neelon Dec. Ex. 9). It referred to Neelon as an attorney in the United States and a member of the Massachusetts Bar Association. (Compl. ¶ 65).

The complaint further alleges that defendant Krueger was involved in the preparation of a blog entry on stockhouse.com entitled "Alleged Criminal Daniel P. Neelon," which was posted on September 24, 2011, within twelve hours of the September 23 press release. (Compl. ¶ 71).

Finally, the complaint refers to financial statements that Garrison International posted on sedar.com in October 2011, which also referred to a pending criminal action against Neelon. (Compl. ¶¶ 76, 77).

The complaint alleges that defendants knew or should have known that several of the statements contained in their press releases, e-mails, blog posts, and published statements—in particular, those regarding a criminal action against Neelon—were false. It further alleges that defendants intended to cause harm to Neelon's reputation and profession in Massachusetts, and intended for those reading the release to believe that Neelon had been charged with a crime by a governmental authority in Mongolia.

### B.  Procedural Background

On July 2, 2012, Daniel Neelon initiated the present action against Blair Krueger and Desert Eagle Resources, Ltd.  The complaint alleges claims of defamation, defamation *per se*, violation of Mass. Gen. Laws ch. 93A, and tortious interference with prospective economic relationships.

This is the third action that plaintiff has brought against defendants.  On August 11, 2011, plaintiff and Cohen jointly filed suit against defendants and others in Quebec, Canada.  In February 2012, plaintiff voluntarily dismissed his claims; the lawsuit continued as to only Cohen's claims.  On January 31, 2012, plaintiff filed a similar suit in the United States District Court for the Central District of California.  Following a motion to dismiss for *forum non conveniens*, plaintiff dismissed his claims against Krueger and Desert Eagle; claims against the other defendants were later dismissed.

On December 21, 2012, plaintiff filed an amended complaint.  Defendants have now moved to dismiss that complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and insufficient process pursuant to Fed. R. Civ. P. 12(b)(5).

## II.  Personal Jurisdiction

Defendants have moved to dismiss the complaint on the ground that the Court lacks personal jurisdiction over them.  Plaintiff contends that he has sufficiently alleged a basis for personal jurisdiction based on defendant's intentional actions directed at Massachusetts.

### A.  General Principles

The plaintiff bears the burden of showing that a court has personal jurisdiction over a defendant.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st

Cir. 2002). A district court faced with a motion to dismiss under Rule 12(b)(2) may choose among several methods for determining whether the plaintiff has met its burden: the "*prima facie*" standard, the "preponderance-of-the-evidence" standard, or the "likelihood" standard. *Id.* at 50-51; *Foster-Miller, Inc., v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-78 (1st Cir. 1992).

Where, as here, a district court considers a motion to dismiss for lack of personal jurisdiction without first holding an evidentiary hearing, the *prima facie* standard governs its determination. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). This standard is the "most conventional" of the methods for determining personal jurisdiction. *Daynard*, 290 F.3d at 51 (quoting *Foster-Miller*, 46 F.3d at 145). In conducting a *prima facie* analysis, the court is required to take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed), construing them in the light most favorable to the plaintiff; the court, however, should not credit "conclusory allegations or draw farfetched inferences." *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994). The court can "add to the mix [any] facts put forward by the defendants, to the extent that they are uncontradicted." *Daynard*, 290 F.3d at 51. Although the court will construe the facts in the light most favorable to the plaintiff in a motion to dismiss, the plaintiff still has the burden of demonstrating each jurisdictional requirement. *See Swiss Am. Bank*, 274 F.3d at 618.

The exercise of personal jurisdiction over a defendant must be both authorized by statute and consistent with the due process requirements of the United States Constitution. *See, e.g., Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996); *Intech, Inc., v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005); *Good Hope Indus., Inc. v. Ryder Scott, Co.*,

378 Mass. 1, 5-6 (1979).  Furthermore,

> A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction.  Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities.  General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.

*Swiss Am. Bank*, 274 F.3d at 618 (citations and quotations omitted).

Although the complaint does not specifically allege whether this Court's jurisdiction over the defendant is specific, general, or both, plaintiff's briefing makes clear that he is advancing a theory of specific jurisdiction.

### B. <u>Specific Jurisdiction</u>

In Massachusetts, a federal court can assert specific personal jurisdiction over an out-of-state defendant in a diversity case only if the Massachusetts long-arm statute so allows and the exercise of jurisdiction is consistent with the due process requirements of the United States Constitution.  *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F. 2d 9, 11 (1st Cir. 1990).  The Massachusetts Supreme Judicial Court has consistently interpreted the long-arm statute to extend to the limits allowed by the United States Constitution.  *See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972); *accord Tatro v. Manor Care, Inc*., 416 Mass. 763, 771 (1994).  Thus, the First Circuit has held that a district court "may sidestep the [long-arm statute] inquiry and proceed directly to the constitutional analysis." *Evans Cabinet Corp. v. Kitchen Int'l, Inc.*, 593 F. 3d 135, 146 (1st Cir. 2010).

This Court may exercise personal jurisdiction consistent with the Due Process clause only if it finds that defendant has maintained "minimum contacts" with the state "such that

maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The minimum-contacts analysis has three steps—relatedness, purposeful availment, and reasonableness:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007) (citing *Daynard*, 290 F.3d at 60). The "gestalt" factors address the fairness of subjecting the defendant to the court's jurisdiction by analyzing:

> (1) the defendant's burden of appearing in the forum;
> (2) the forum state's interest in adjudicating th[e] dispute;
> (3) the plaintiff's interest in obtaining convenient and effective relief;
> (4) the judicial system's interest in obtaining the most effective resolution to th[e] controversy; and
> (5) the common interest of all sovereigns in promoting substantive due process.

*Evans Cabinet Corp.*, 593 F.3d at 146.

### 1. Relatedness

The "relatedness" inquiry for tort claims focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action. *Swiss Am. Bank*, 274 F.3d at 622. Here, plaintiff contends that he has suffered injuries to his professional reputation and standing as an attorney in Massachusetts as a result of defendant's publication of defamatory information in press releases, e-mails, and other publications.

Plaintiff has clearly alleged that his claims arise out of defendant's conduct, and thus has

satisfied the "relatedness" requirement. To the extent that defendants contest that any of their conduct can properly be characterized as "in-forum," that argument is better addressed in the second part of the minimum contacts analysis, the "purposeful availment" requirement.

### 2.   **Purposeful Availment**

In the context of a defamation suit, the First Circuit has indicated that "[t]he decisive due process issue . . . is whether the defendants' activities satisfy the purposeful availment requirement." *Noonan v. Winston Co.*, 135 F.3d 85, 90 (1st Cir. 1998). In answering this question, courts are guided by the reasoning set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, the Supreme Court addressed a case involving two Florida reporters who wrote a libelous article about a California entertainer for publication in a national tabloid. The Supreme Court held that California courts could properly exercise jurisdiction over the nonresident defendants because

> (i) their intentional actions were aimed at the forum State, (ii) they knew that the article was likely to have a devastating impact on the plaintiff, and (iii) they knew that the brunt of the injury would be felt by the plaintiff in the forum State where she lived, worked, and the article would have the largest circulation.

*Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989) (citing *Calder*, 465 U.S. at 789-90).

Since *Calder*, courts have recognized the complicated and fact-intensive nature of the "purposeful availment" inquiry, and have struggled to define the circumstances under which they may properly exercise jurisdiction over out-of-forum defendants. It is clear that the existence of injurious effects in the forum state is not, without more, sufficient to sustain jurisdiction. Rather, in the context of defamation, the focus of the "purposeful availment" inquiry is whether it "can be fairly inferred that [defendants] intended the brunt of the injury to be felt" in the forum state. *Hugel*, 886 F.2d at 5.

Here, plaintiff focuses on two actions by the defendants that he alleges were "aimed" at Massachusetts, and were intended to injure plaintiff in Massachusetts. First, plaintiff points to Krueger's August 9, 2011 e-mail to Jules Grossard as an act of "purposeful availment." That e-mail was sent from Krueger's office in Toronto to Grossard in Quebec. (Krueger Decl. ¶ 24). In the e-mail, Krueger indicated his intention to report plaintiff's allegedly unlicensed practice of law in Mongolia to the "Massachusetts Bar Association"; he also alleged that plaintiff had violated the federal Foreign Corrupt Practices Act, and implied that he intended to contact "the appropriate authorities in the USA."

Second, plaintiff points to defendants' press release of September 23, 2011. That release was published through two services: Marketwire.com, a press release distribution service with international readership and offices in Toronto, Boston, and Los Angeles, (Neelon Dec. ¶¶ 40, 43); and news.investors.com, a website that is part of Investors Business Daily, Inc. (Compl. ¶ 58). The press release identified plaintiff by name as an attorney and a "member of the Massachusetts Bar Association," and referred repeatedly to a pending criminal action against him in Mongolia.

The issue is whether defendants' conduct was expressly aimed at Massachusetts. Defendants do not dispute that they made public reference to plaintiff's Massachusetts bar license in an article discussing criminal charges that were allegedly pending against him in Mongolia. However, they contend that the article was published in Canada, and did not target Massachusetts in any way.

While the article was sent from Toronto, it was published on a press release distribution service and a business investor publication's website, both of which could be accessed globally.

Further, unlike defendants' May 20, 2011 press release, the publication does not merely refer to "two men" when it alleges criminal activity. Defendants' decision to identify plaintiff as a Massachusetts attorney certainly gives rise to a fair inference that defendants knew or should have known that the allegations would have a negative impact on plaintiff's reputation and business prospects—harm that would be felt principally in Massachusetts. It also supports a reasonable inference that defendants *intended* this effect.

That inference is further supported by Krueger's e-mail indicating his intent to contact authorities in the United States—and specifically in Massachusetts—about plaintiff's conduct. While the act of contacting the Board of Bar Overseers cannot itself give rise to civil liability, referring to possible complaints to the Board and other authorities in communications with third parties is not similarly protected. Taking these statements in the light most favorable to the plaintiff, they can fairly be inferred as demonstrating an intent to impugn plaintiff's reputation and career prospects in Massachusetts, where plaintiff had an established law practice.

A finding of personal jurisdiction in this case is also supported by the First Circuit's analysis in *Hugel v. McNell*, 886 F.2d 1 (1st Cir. 1989). In *Hugel*, defendants met with two *Washington Post* reporters. Allegedly, they advised the reporters that Hugel—a New Hampshire resident and the Deputy Direction of Administration for the CIA at the time—was engaging in illegal securities transactions. The *Washington Post* printed a front-page article based on defendants' allegations, and Hugel was forced to resign his position at the CIA. Although the statements were published in a national newspaper, and did not single out New Hampshire, the First Circuit found that the plaintiff had sufficiently alleged that the defendants "actually directed their actions at a New Hampshire resident." *Hugel*, 886 F.2d at 5. The court reasoned that:

> [Defendants] knew that release of the allegedly false information would have a devastating impact on Hugel, and it can be fairly inferred that they intended the brunt of the injury to be felt in New Hampshire where Hugel had an established reputation as a businessman and public servant . . . The intended result of the [defendants'] contact with the reporters and release of information to them, according to the complaint, was to impugn Hugel's honesty, integrity, and his ability to perform duties as either a public official or businessman.

*Id.* Here, the same intended result can be inferred from defendants' publication of a press release referring to a pending criminal case against a licensed Massachusetts attorney.[4]

When construed in the light most favorable to the plaintiff, the facts as pleaded are sufficient to support the allegation that defendants intended for their actions to cause injury to plaintiff in Massachusetts. Accordingly, plaintiff has sustained his burden of demonstrating the "purposeful availment" requirement.

### 3.   Reasonableness

Even if plaintiff has demonstrated that both the "relatedness" and "purposeful availment" requirements have been met, the court's exercise of jurisdiction must also "comport with fair play and substantial justice." *U.S.S. Yachts*, 894 F.2d at 11. The Supreme Court has identified five "gestalt factors" that bear upon the fairness of subjecting nonresidents to this Court's jurisdiction. *Sawtelle v. Farrell*, 70 F.3d 1381, 1394 (1st Cir. 1995). These factors are as follows:

(1) the defendant's burden of appearing in the forum;

---

[4] The Court is not persuaded that the reasoning of *Broadvoice, Inc. v. TP Innovations*, 733 F. Supp. 2d 219, 224 (D. Mass. 2010) requires a different result. That case addressed the question of whether a defendant's interactive website that was neither commercial in nature, nor directed specifically to a Massachusetts audience, could satisfy the purposeful availment test. *Id.* at 224-25. The publication in that action was limited to the defendant's own website. Here, while defendants did post the press releases on their website, they also distributed the press releases to a worldwide audience through third-party websites, including a paid marketing service. That additional step evinces an intent to reach a broader audience than just individuals visiting defendants' own site. The First Circuit has indicated that "widespread circulation of a publication indicates deliberate action." *Noonan*, 135 F.3d at 91.

   (2) the forum state's interest in adjudicating th[e] dispute;
   (3) the plaintiff's interest in obtaining convenient and effective relief;
   (4) the judicial system's interest in obtaining the most effective resolution to th[e] controversy; and
   (5) the common interest of all sovereigns in promoting substantive due process.

*Evans Cabinet Corp.*, 593 F.3d at 146.

### a. **Defendant's Burden**

Defending in a foreign jurisdiction almost always presents some measure of inconvenience. Thus, the First Circuit has required a defendant seeking relief from a court's exercise of jurisdiction based on this factor to demonstrate "a special or unusual burden." *Sawtelle*, 70 F.3d at 1395. Here, defendants claim no such burden, and the Court notes that Massachusetts is not an especially burdensome location for litigation for Toronto-based defendants. The Court concludes that this factor is essentially neutral.

### b. **Forum State's Interest**

The First Circuit has indicated that "[t]he purpose of [this] inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest." *Foster-Miller*, 46 F.3d at 151.

Here, a Massachusetts resident and attorney alleges that he has been the victim of defamation and other intentional torts that have caused him injury within the Commonwealth. A state "generally has a manifest interest in providing its resident with a convenient forum for redressing injuries inflicted by out of state actors. *Burger King Corp. v. Rudzewicz*, 471 U.S. 463, 573 (1985). Thus, Massachusetts has a clear interest in the outcome of this dispute. This factor cuts in favor of a finding of personal jurisdiction.

14

### c.     Plaintiff's Interest in Convenient Relief

It is well-settled that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395. It is unquestionably more convenient for plaintiff, a Massachusetts resident, to litigate his claims in his home state. This factor cuts in favor of a finding of personal jurisdiction.

### d.     Judicial System's Interest in Effective Resolution

Plaintiff asserts that the "potentially crushing financial burden" that he would face if he were to pursue this action in Canada indicates that Massachusetts is the best forum for effective resolution of his claim. He also contends that any court hearing the action would apply Massachusetts law, as the injury occurred in the Commonwealth.

Defendants have not countered either of these arguments. Thus, this factor appears to cut in favor of a finding of personal jurisdiction.

### e.     Common Interest of All Sovereigns

The final factor is the common interest of all sovereigns in promoting substantive social policies. *Sawtelle*, 70 F.3d at 1395. This factor does not cut strongly in either direction. The First Circuit has previously recognized the ability of a state to provide a convenient forum for its residents as a prominent policy factor to be considered. *Id.* The Court views this factor as either neutral or cutting slightly in favor of a finding of personal jurisdiction over the defendants.

In summary, the "gestalt factors" cut in favor of the exercise of this Court's jurisdiction.

### 4.     Conclusion

Because all three elements of the First Circuit's minimum contacts analysis are satisfied, defendants' motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P.

12(b)(2) will be denied.

## III.   Service of Process

Defendants have also moved to dismiss for insufficient service of process. They contend that neither Krueger nor Desert Eagle were properly served with the original complaint within 120 days of filing, as required by Fed. R. Civ. P. 4(m).

### A.   General Principles

When the sufficiency of service of process is challenged under Fed. R. Civ. P. 12(b)(5), plaintiff bears the burden of proving proper service. *Lopez v. Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir. 1992).

Rule 4 sets forth the acceptable methods by which service of process can be effected. Fed. R. Civ. P. 4. Under Rule 4(f), an individual in a foreign country may be served by an internationally accepted means of service that is reasonably calculated to give notice.[5] Under Rule 4(h)(2), a corporation, partnership, or association that is served in a foreign country may be served "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."

---

[5] Rule 4(f) provides that an individual may be served:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
  (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
  (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
  (C) unless prohibited by the foreign country's law, by:
     (i) delivering a copy of the summons and of the complaint to the individual personally; or
     (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Generally, service of process must occur within 120 days after the complaint is filed. Fed. R. Civ. P. 4(m). The rule provides that:

> [i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice . . . But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

Plaintiff filed suit on July 2, 2012. Plaintiff's counsel then retained Select Document Services—a Toronto-based company that serves court documents in Canada—to serve process on defendants. (Spencer Aff. ¶¶ 3-4). On July 17, 2012, Christian Spencer, a manager at the company, attempted to serve process on defendants at the Toronto offices of Desert Eagle Resources. Spencer identified himself and his purpose, and was met by a woman named Bulgan Orgilsaikhan, who stated that she was authorized to accept service on behalf of Desert Eagle Resources. (Spencer Aff. ¶ 7). Plaintiff was unaware that defendants believed this service to be insufficient until defendants filed their motion to dismiss. Spencer was unable to serve process on Krueger at the time, as he was not present at the office.

On September 5, 2012, another process server attempted service on Krueger at his home address. (Spencer Aff. ¶ 8). A woman who identified herself as Krueger's wife answered the door. She indicated that she was aware of the lawsuit, but that her husband was unavailable and would be leaving the country later that day. (Spencer Aff. ¶ 8). Process servers returned to the house to attempt process later the same evening, and again on October 10 and October 16, but no one answered the door. (Spencer Aff. ¶ 9).

On November 30, 2012, defendants moved to dismiss for, among other things, insufficient service of process. Three weeks later, on December 21, plaintiff filed an amended

complaint. Defendants do not contest that they have been properly served with the amended complaint.

As soon as plaintiff filed his amended complaint, that document became the operative pleading. Because the original complaint is no longer operative, defendants' motion to dismiss that complaint for insufficient service of process is moot.

In any event, even if defendants' motion were not moot, it would be denied. The motion is based on Fed. R. Civ. P. 4(m), which provides that a plaintiff has 120 days from the date a complaint is filed to serve process on all defendants. By its terms, the rule states that it "does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1)." Fed. R. Civ. P. 4(m). Rule 4(f) governs service of individuals in foreign countries. Courts have interpreted this rule, consistent with its plain meaning, as removing any deadline for serving a complaint on an individual in a foreign country. *Lucas v. Natoli*, 936 F.2d 432, 433 (9th Cir.); *Pennsylvania Orthopedic Ass'n v. Mercedes-Benz A.G.*, 160 F.R.D. 58 (E.D. Pa. 1995). Thus, plaintiff was not bound to serve Krueger within the 120-day time period.

As to Desert Eagle, Rule 4(m) states that the court must extend the time for service where a plaintiff can show good cause for a failure to serve process. Plaintiff's process server made timely service upon Ms. Orgilsaikhan, an employee at Desert Eagle's offices, who represented that she was authorized to accept service on Desert Eagle's behalf. Defendants did not inform plaintiff that this service was deficient until approximately 150 days after the complaint was filed. Plaintiff thus had good cause for the alleged failure to serve.

Accordingly, defendant's motion to dismiss for insufficient service of process will be denied.

**IV.    Defendant's Motion to Strike**

Defendants have moved to strike Neelon's Declaration in Support of the Surreply. In the affidavit, plaintiff asserts that a bank employee told him that the bank denied him a loan in part because of defendants' press release of September 23, 2011. They contend that the statements are hearsay, and should therefore be struck from the record.

Defendants do not cite to any case for the proposition that a Court must, when considering a motion to dismiss for lack of personal jurisdiction, strike any affidavit that is based on hearsay. While a motion to strike is the proper vehicle for challenging the admissibility of an affidavit offered at summary judgment, *Casa Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994), defendants cite no authority for the proposition that hearsay affidavits cannot be considered for the purpose of determining personal jurisdiction.

The law appears to be unsettled. At least some courts have held that hearsay statements may be considered for purposes of determining personal jurisdiction. *See, e.g., Campbell Pet Co. v. Miale*, 542 F.3d 879, 888-89 (Fed. Cir. 2008); *see also IHFC Props., LLC v. APA Mktg.*, 850 F. Supp. 2d 604, 620 n.10 (M.D.N.C. 2012). Other courts have suggested that such statements may not be considered. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009). This Court need not, however, decide this issue. Whether defendants are correct or not, Neelon's Declaration in Support of the Surreply played no role in this Court's resolution of the jurisdictional issue. Accordingly, the motion to strike will be denied as moot.

**V.    Conclusion**

For the foregoing reasons, defendants' motion to dismiss is DENIED, and defendants' motion to strike is DENIED as moot.

**So Ordered.**

                                          /s/ F. Dennis Saylor
                                          F. Dennis Saylor IV
Dated:  May 29, 2013                  United States District Judge