UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIEL P. NEELON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-cv-11198-IT |
| BLAIR KRUEGER and DESERT EAGLE | * | |
| RESOURCES, LTD. f/k/a GARRISON | * | |
| INTERNATIONAL, LTD., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

July 30, 2015

TALWANI, D.J.

I.    Introduction

Plaintiff Daniel P. Neelon ("Neelon"), a Massachusetts attorney, brings claims alleging that

he was harmed by public statements made in Canada by Defendants about events occurring in

Mongolia.  In broad strokes, the factual allegations are as follows.[1]  In order to finance mining

exploration in Mongolia, Garrison Asia, Ltd. ("Garrison Asia") and Defendant Blair Krueger

("Krueger") entered into a loan agreement with Georges Cohen ("Cohen").  Neelon drafted the loan

agreement.  The loan agreement included a default and remedy provision stating that, upon a default

on the loan's terms, Cohen could take ownership of Garrison Asia from its parent company,

Defendant Desert Eagle Resources, Ltd., formerly known as Garrison International, Ltd. ("Garrison

International").

---

[1] The parties' factual allegations have been set forth in detail in prior orders.  Here, the court
provides a detailed recitation of only those facts determinative of Defendants' claims for summary
judgment.  Such facts appear within the analysis of each claim.

Soon after the loan agreement was signed, ownership of Garrison Asia was transferred to Cohen. The parties dispute the details of how this transfer occurred, whether a default precipitated the transfer, and whether the transfer was completed legally. What is agreed upon, however, is that Defendants thereafter filed a complaint requesting that Mongolian officials commence a criminal investigation of the transfer. Defendants subsequently published two press releases from Canada through an online wire service. These releases made statements regarding the allegedly unlawful transfer of Garrison Asia's ownership, the complaint filed with Mongolian authorities, the ensuing investigation by authorities, and the criminal charges that allegedly resulted.

Neelon claims that these press releases were defamatory. Neelon also brings a claim for violation of Mass. Gen. Laws. ch. 93A ("Chapter 93A"), which prohibits unfair or deceptive business acts or practices. Now before the court is Defendants' Motion for Summary Judgment [#321]. As set forth below, this motion is DENIED as to the defamation claims (Counts I and II) and ALLOWED as to the Chapter 93A claim (Count III).

II.     Summary Judgment Standard

Summary judgment is appropriate only where the movant shows that there are no genuine disputes of material fact and summary judgment is warranted as a matter of law. See Fed. R. Civ. P. 56(a). A fact is material if it "has the potential to change the outcome of the suit under the governing law." Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995). A material fact is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

III.    Defamation and Defamation *Per Se* (Counts I & II)

A. *Choice of Law*

The parties dispute whether Canadian or Massachusetts law governs Neelon's claims for defamation relating to Defendants' May 20, 2011 and September 23, 2011 press releases.

2

Defendants assert that Canadian law applies because they issued the publications from Canada and had a subjective expectation that Canadian law would govern their conduct.  <u>See</u> Defs.' Mem. Law Supp. Mot. Summ. J. 1-2 [#322] [hereinafter Defs.' Mem.].  Neelon argues that Massachusetts law should govern because the statements were published to Massachusetts, he is a Massachusetts resident, and he suffered harm from the statements principally in Massachusetts.  <u>See</u> Pl.'s Opp'n Defs.' Mot. Summ. J. 1-2 [#335] [hereinafter Pl.'s Opp'n].

In determining which substantive law to apply, the court looks to Massachusetts choice-of-law rules.  <u>See</u> <u>Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc.</u>, 145 F.3d 463, 479 (1st Cir. 1998).  For issues of tort, Massachusetts does not "tie . . . conflicts law to any specific choice-of-law doctrine, but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."[2] <u>Bushkin Assocs. v. Raytheon Co.</u>, 473 N.E.2d 662, 668 (Mass. 1985).  The Massachusetts Supreme Judicial Court ("the Supreme Judicial Court") has held, however, that the <u>Restatement (Second) of Conflicts of Laws</u> (1971) ("the Restatement") is an "obvious source of guidance" for choice-of-law questions.  <u>Bushkin</u>, 473 N.E.2d at 669.

Section 150(2) of the Restatement states that, in cases involving multistate defamation, "the state of [the] most significant relationship will usually be the state where the person was domiciled at the time [of the alleged defamation], if the matter complained of was published in that state." There is no dispute that Neelon was a Massachusetts domiciliary in May and September 2011. Accordingly, the court will apply Massachusetts law unless the factors articulated in section 6 of the

_____

[2] Although articulated as a choice between the law of different states, the same approach has been adopted to resolve questions of Massachusetts law versus the law of a foreign country.  <u>See, e.g.</u>, <u>Xuncax v. Gramajo</u>, 886 F. Supp. 2d 162, 195-96 (D. Mass. 1995).

Restatement show that Canada has a more significant relationship to the occurrence.[3]  See

Restatement § 150(1) (allowing for consideration of section 6 factors to determine the state with the

most significant relationship).

> The factors articulated in section 6 are as follows:
>
> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement § 6.  Applied to the facts of this case, these factors do not rebut the presumption that

Massachusetts law governs Neelon's defamation claims.

Massachusetts has an interest in protecting its citizens from reputational harm caused by

defamatory speech, and the September press release identified Neelon as a Massachusetts lawyer.

Moreover, a reasonable speaker in 2011 would know that using an online wire service with

multinational reach creates a global, not Canada-specific, audience.  Accordingly, Defendants'

assertion that they subjectively believed only Canadian law would govern their statements is

accorded little weight.  In light of the ability for instantaneous multinational publication, the court

will also not assign undue weight to the forum in which a statement was physically uploaded onto

the internet.  Doing so would incentivize publication from less protective forums and undercut the

legitimate interest of states in protecting their citizens from harm.  The ease of determining and

assessing the contours of Massachusetts law also favors its application.  For the above-stated

reasons, the court finds that Massachusetts law applies to Neelon's defamation claims in this case.[4]

---

[3] Although Massachusetts does not require strict adherence to the Restatement, both parties' arguments on choice of law rely exclusively on the Restatement, and Defendants have not identified any other factors for the court's consideration.

[4] The court's weighing of these factors is not changed by Defendants' argument that the press releases were mandated by the TSX Venture Exchange ("TSX"), which is a Canadian stock

### B.  A Jury Could Find the Press Releases Defamatory

On May 20, 2011 Defendants issued a press release titled "Garrison International Ltd.:

Unauthorized Transfer of Company Subsidiary," which states in relevant part that:

> The company stamp for Garrison Asia LLC . . . was taken from the office of Garrison Asia LLC without the knowledge or permission of any of the Officers or Directors of the Company. . . .  [The] stamp was used to transfer the ownership of the shares of Garrison Asia LLC away from the Company. . . .  Notwithstanding the use of the stamp, in order to change the ownership of Garrison Asia LLC, a notarized signature from the signing authorities of this company would have been required.  It is not clear at this time how the notarized signatures were obtained by the two men who took the stamp from Garrison's office in Ulaan Baatar, Mongolia.

See Am. Compl., Ex. 4 [#18-4] [hereinafter May Release].  The press release continues:

> [T]he matter was reported to the Mongolian Police who have conducted an investigation and interviewed those involved.  As a result of their investigation, the Mongolian Police have recommended to proceed with a criminal trial.  Such trial is pending for those accused of this action.

Id.

On September 23, 2011, Defendants issued another press release that states, in

relevant part:

> The Company . . . wishes to notify its shareholders with an update in regard to its News release of May 20, 2011 concerning its statement of the unauthorized transfer of the Company's subsidiary in Mongolia that occurred in January and February 2011, that a criminal action has been filed in Mongolia against Georges Cohen, a former Director of Garrison International Ltd., and Daniel Neelon, Counsel of Mr. Cohen, and has been assigned case number 21147156.  The criminal action pending against Mr. Cohen and Mr. Neelon was filed under section 236 of the Mongolian Criminal Code which refers to "a procedure which has caused substantial damage to a business entity" and may be reviewed under Section 148 which is entitled "Appropriation of Property by Fraud" or Section 150 which is entitled "Misappropriation or Embezzlement of Property."  The action is currently under investigation by the Mongolian Police.

---

exchange on which Garrison International was publicly traded.  The record reveals that TSX told Defendants that they needed to inform investors in May about Garrison Asia's transfer and to inform investors in September about civil litigation in Canada.  Nothing in the record suggests that TSX controlled the content of the press releases or required publication of statements alleging that Neelon was facing criminal charges.

See Am. Compl., Ex. 2 [#18-2] [hereinafter Sept. Release].

The summary judgment record includes the following documentary evidence related to the criminal investigation in Mongolia.[5]  First, a document showing that on April 29, 2011 Garrison International's Director filed a "Claim on Criminal case" with the Mongolian State Investigation Office.  See Aff. Batbuyan Sodnomjamts, Ex. B [#322-19] [hereinafter Batbuyan Aff.].  This claim by Garrison International's Director alleges that Cohen and Neelon wrongfully transferred ownership of Garrison Asia away from Garrison International and states that "we ask you [the Mongolian authorities] to check the organized crime by Georges Cohen and his lawyer Dan Neelon."  Id.

Second, a document written by a Police Major and Senior Investigator of the Mongolian State Investigation Office, dated May 18, 2011, and titled "Refusal to Originate a Criminal Case."  See Decl. L. Danzannorov, Ex. 1 [#334-2] [hereinafter Danzannorov Decl.].  This document states that:

> [u]pon checking and carrying out emergent operation on the complaint that Georges Cohen, a citizen of Canada transferred shares of "Garrison Asia" LLC . . . in cooperation with Daniel P. Neelon . . . .  It was . . . found that the transfer of the shares of the Company was grounded . . . and found that the complaint does not include any fraud crime's component . . . .  THERE IS NOT ANY LEGAL GROUND TO ORIGINATE THE CRIMINAL CASE.

There is no case number on this document.  See id.

Third, a document written by the "Inspection Procurator of the Procurator's Authority of the Capital city,"[6] dated June 2, 2011 and titled "Resolution on Instigating the Criminal Case."  See

---

[5] The parties have provided copies of the original documents in Mongolian as well as English translations.  Neither party disputes the accuracy of the translations.  Accordingly, the court relies on the translated documents.  All translated language is quoted verbatim.

[6] "Procurator" is a term deriving from Roman law and meaning "a government official."  See Procurator, Black's Law Dictionary (10th ed. 2014).  Plaintiff provides another translation of this document, which uses the term "prosecutor."  See Danzannorov Decl., Ex. 1.

Batbuyan Aff., Ex. D.  In this document, the procurator declares that he has reviewed the May 18

refusal to originate a criminal case and disagrees with its findings as to Georges Cohen.  See id.

The procurator then declares that his office is "DETERMINING . . . [i]t is about to instigate the

Criminal Case on the name of Canadian citizen Georges Cohen in accordance with Article 236.1 of

Criminal Law of Mongolia."  See id.  Neelon's name is not present in the document.  See id.  The

document is marked as criminal case number 21147156.  See id.

On the basis of this evidence, there is a genuine dispute of fact as to whether the press

releases were defamatory.  Specifically, a reasonable jury presented with the May 18 document

titled "Refusal to Originate a Criminal Case" could find that the statement made on May 20 that

"the Mongolian Police have recommended to proceed with a criminal trial" was defamatory.[7]

Similarly, a reasonable jury presented with the June 2 document, which states that criminal charges

would be brought against Cohen and assigned case number 21147156, but makes no mention of

Neelon, could find that it was defamatory to state on September 23 that a "criminal action has been

filed in Mongolia against . . . Daniel Neelon . . . and has been assigned case number 21147156."

The potential for a reasonable jury to find these statements defamatory is not lessened by the

undisputed fact that Defendants' own complaint referenced Neelon as well as Cohen.  The filing of

a complaint by an alleged victim is distinct from a governmental decision to press charges.  The

May press release states that Mongolian officials recommended proceeding with a criminal trial.

The September press release's reference to case number 21147156 also creates the impression that

the government had officially charged Neelon.  Notwithstanding Defendants' April complaint, a

reasonable jury could find these statements defamatory given the May 18 document, which refused

---

[7] Because this press release does not mention Neelon by name, it could only be defamatory when
read in conjunction with the September press release.

to originate a criminal case, and the June 2 document, which opened criminal case 21147156 but did not include Neelon's name.

Defendants attempt to rebut the existence of genuine disputes of material fact by reference to communications between Neelon, the U.S. Embassy, and Mongolian officials, which Defendants assert show that Neelon was charged criminally by the Mongolian government in case number 21147156. This attempt fails.[8]

First, Defendants cite an email sent by the U.S. Embassy to Neelon stating that the Embassy is "inquiring from the [Mongolian] State Investigator's Office about what specific criminal charges you are facing." Aff. Damian LaPlaca Supp. Defs.' Mot. Summ. J., Ex. 8 [#322-29] [hereinafter LaPlaca Aff.]. Defendants assert that the U.S. Embassy's statement proves that Neelon and the Embassy understood that Neelon had been criminally charged. Defendants omit reference, however, to Neelon's email to the Embassy. In that email, Neelon states "I was told very specifically this morning by . . . [Defendant] Blair Krueger . . . that he was told Friday by the police that warrants are to be issued Monday . . . . I asked for what and he did not respond." Id. In other words, the U.S. Embassy's statement appears to be in response to Neelon's assertion that Krueger said he would soon be facing criminal charges. Defendants cannot rebut the existence of a genuine dispute of material fact by relying on a phrase from the U.S. Embassy's email while ignoring the underlying email suggesting that Neelon's impression that he was to be criminally charged came from Defendants themselves.[9]

---

[8] Because the court finds that this evidence does not support summary judgment for other reasons, it does not reach Neelon's objection that many of the statements relied on by Defendants amount to inadmissible hearsay.

[9] Defendants' reliance on Neelon's statement in a letter sent to Vice Colonel Azbayar of the Mongolian National Police that he does not understand how he could be legitimately "charged criminally" is similarly misplaced. See LaPlaca Aff. Ex. 9. When read fairly, the letter indicates that Neelon heard rumors that he would face criminal charges and wrote the letter to argue that no charges were warranted. See id. Defendants also cite a letter from Neelon to a Mongolian

Defendants also rely on two bar transit orders—issued on June 9 and August 10, 2011, by Mongolian authorities to keep Neelon from leaving the country—and a letter sent on September 5, 2011, by Mongolian authorities to the U.S. Embassy regarding those bar transit orders.  The language in these three documents is the same: "Daniel Neelon is investigating [sic] by the Criminal Case No. 21147156 in the Investigation Department of the Police Department."  See, e.g., Batbuyan Aff., Exs. F, J, L.  Defendants argue that this language proves Neelon was criminally charged in case 21147156.  However, a jury could find that the language of these letters only identifies Neelon as a party involved in the investigation; it does not inform the reader whether he is a suspect as opposed to a material witness.  Presuming the documents are admissible (a question the court does not reach at this time), the language does not support the contention that there is an absence of a material dispute of fact as to whether the press releases were defamatory.

C.  *A Reasonable Jury Could Find that Defendants Were At Fault*

Defendants argue further that summary judgment is warranted because Neelon is a private party and Defendants were not negligent in publishing the press releases.  See Defs.' Mem. at 9-10 (citing Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 511 (Mass. 2003)).  Defendants assert that they conducted an investigation into the alleged unlawful share transfer before writing the press releases; that Mongolian and Canadian counsel reviewed draft releases before publication; and that the TSX Venture Exchange ("TSX"), which was the stock exchange on which Garrison International was traded, reviewed and edited the content of the releases.  According to Defendants, these facts establish beyond dispute that they were not negligent in publishing the statements.  Id.

---

prosecutor in which Neelon states that Defendants filed a "criminal complaint" against him on April 29.  See id. Ex. 10.  The fact that Defendants filed a complaint with Mongolian authorities seeking to have Neelon investigated for alleged criminal wrongdoing is undisputed.  More importantly, it is inapposite to the question of whether, in May 2011, the Mongolian authorities had recommended proceeding with a criminal trial and, in September 2011, whether government authorities had named Neelon as a party in a criminal case.

Defendants' attempt to assign responsibility regarding the content of the press releases to TSX is unavailing.  As to the May press release, TSX contacted Defedants to inquire about their reported default of a loan and stated that, unless Defendants responded, TSX might place a trading halt on Garrison International shares.  See Aff. Blair Krueger Supp. Mot. Summ. J., Ex B at 2 [#322-3] [hereinafter May TSX Communications].  Defendants then contacted TSX, said they had resolved the default, and submitted a draft press release stating that "a theft has occurred at the office of Garrison Asia . . . that has resulted in some fraudulent activities being conducted regarding ownership of its Mongolian subsidiary. . . .  Garrison is confident that at the end of the [Mongolian police] investigation all items taken from the company will be returned."  Id. at 3, 7.  TSX responded that the press release needed to "contain specifics of the fact that the shares of Garrison Asia LLC have been transferred without proper approvals, what impact this has on the Company's operations and the steps the Company is taking to resolve this matter."  Id. at 8.  It therefore appears that TSX's request for information about a transfer "without proper approvals" arose in response to Defendants' assertion in their draft press release that theft and fraud had occurred.

As to the September release, TSX identified the filing of a civil lawsuit in Canada against Defendants and stated that a press release "providing complete details of the Civil Action and the events between the Company and Mr. Haligua Cohen that lead to its filing" was required.  See Aff. Blair Krueger Supp. Mot. Summ. J., Ex. E at 4 [#322-6] [hereinafter Sept. TSX Communications]. This communication did not require that Defendants include information about the alleged Mongolian criminal charges.  Accordingly, there is nothing in the record from which the court can conclude that TSX mandated the specific factual content of the press releases.[10]  To the contrary,

---

[10] Although TSX edited the press releases, a review of those edits show that they were non-substantive.  See May TSX Communications at 65-66 (providing grammatical and stylistic edits); Sept. TSX Communications at 28-29 (adding comments requesting clarification or additional details).

the press releases bear a disclaimer that "[n]o stock exchange, securities commission, or other regulatory authority has approved or disapproved the information contained herein. . . .  Neither TSX . . . nor its Regulation Services Provider . . . accepts responsibility for the adequacy or accuracy of the release."  See May Release 1-2; September Release 2.

Moreover, a reasonable jury could find Defendants negligent despite their communications with counsel.  Defendants do not assert that the intent of communications with Canadian counsel was to ensure factual accuracy of the press releases.  From evidence in the summary judgment record, it appears that Canadian counsel reviewed the press releases primarily to ensure that they would not detrimentally impact Defendants' defenses in the pending Canadian litigation.  See, e.g., Sept. TSX Communications at 6-7, 17.  The record also includes a request by Defendants, made on the advice of counsel, that TSX not "contact Mr. Cohen and ask for his response or comments" regarding the allegations contained in the press releases.  See May TSX Communications at 33.  While this illustrates that Defendants spoke with counsel, Defendants cannot reasonably assert that a request not to vet allegations supports a claim of due diligence.

Although Defendants requested documentary evidence related to the alleged criminal charges from their Mongolian counsel, and sent those documents to TSX, the summary judgment record shows that the earliest document provided was the June 2 declaration instituting criminal charges against Georges Cohen while not naming Neelon.  Moreover, included in the documents sent by Mongolian counsel is a document that appears to be a letter from Defendants' Mongolian counsel to the Mongolian prosecutor's office, dated July 9, 2011, that *requests* that the prosecutor "consider Dan Nilon [sic] as Suspected Person."  See Sept. TSX Communications at 51-53.  Although the translation of this document is imperfect, a reasonable jury could draw the inference that a letter sent from Defendants' Mongolian counsel asking that Neelon be treated as a suspect suggests that, at the time it was written, Defendants and their counsel understood that he was not a

11

suspect.  This inference, combined with a lack of later documentary evidence showing that Neelon was expressly charged by Mongolian authorities, could allow a reasonable jury to conclude that the press releases included statements exhibiting a negligent disregard for the truth.

Other portions of these communications could further support a reasonable inference that Defendants knew or had reason to know that Neelon had not been charged by Mongolian authorities, and were thus at least negligent in publishing the press releases.  For example, a May 16, 2011, email from Krueger asks TSX to "understand that the system in Mongolia is much more similar to the USA than to Canada where an individual or group can 'press charges.'"  <u>See</u> May TSX Correspondence at 43.  A reasonable jury presented with this statement could find that Defendants knew or had reason to know that a civilian's filing of a complaint with criminal authorities was not the same as the government commencing criminal charges.  Moreover, in a September 16, 2011, email Krueger refers to "the section of the Mongolian Criminal Code which *Cohen* is being charged under" and stated that "he [Cohen] has been charged with fraud." September TSX Communications at 7 (emphasis added).  This correspondence makes no mention of Neelon.

A reasonable jury presented with the evidence in the summary judgment record could conclude that Defendants acted with negligent disregard for the truth in publishing the press releases.  Summary judgment is therefore inappropriate.[11]

---

[11] Even if Canadian law applied to this claim, summary judgment would be inappropriate.  In support of their motion for summary judgment, Defendants state that "[u]nder Canadian law, there is no liability for published information, even if untrue, where (1) the information is on a matter of public interest, and (2) the defendant was diligent in trying to verify the allegations."  <u>See</u> Defs.' Mem. (citing <u>Grant v. Torstar Corp.</u>, [2009] 3 S.C.R. 640, 694 (Can.); <u>Quan v. Cusson</u>, [2009] 2 S.C.R. 712, 724-25 (Can.)).  Accepting this statement of the law as correct for purposes of this motion, it would be a question for the jury whether, on these facts, Defendants acted diligently to verify the allegations.

*D.  The Fair Reporting Privilege Does Not Apply*

Massachusetts recognizes a fair reporting privilege "for fair and accurate reports of official actions and statements."  Howell v. Enterprise Publ'g Co., 920 N.E.2d 1, 13 (Mass. 2010).  This privilege is intended to ensure that publishers, most often news agencies or journalists, can accurately report on official actions or statements of public interest free from the risk of liability if the official document or action is itself defamatory.  See id at 14.

This privilege applies only where a reporter's account of an official action is at least "substantially correct."  The privilege does not protect instances where the reporter has "manipulated, enlarged or embellished" the official report.  Yohe v. Nugent, 321 F.3d 35, 43 (1st Cir. 2003) (quoting Restatement (Second) of Torts § 611 (2002) ("The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to anyone, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.")).

Defendants cite Jones v. Taibbi, 512 N.E.2d 260, 267 (Mass. 1987) for the proposition that a statement, made at the time of arrest, to the effect that the arrested individual would soon thereafter be charged with a crime was protected by the privilege even though no charges were actually filed. Defendants argue that Jones controls this case and requires that the court find that the press releases were substantially correct.  But, the difference between the statements at issue in Jones and those at issue here is significant.  The Jones court held only that that conflation of one official act (arrest) with another official act (charge) was not enough to render the statement less than substantially correct in that case.

Here, Defendants ask that the court find their statement on May 20 that Mongolian authorities had made a recommendation to proceed with a criminal trial substantially correct despite

the May 18 document titled "Refusal to Originate Criminal Case."  Defendants further assert that

the September statement that Neelon was facing criminal charges in Mongolia in case number

21147156 is substantially correct because Neelon was identified in Defendants' April complaint.

Defendants have conflated a private action of filing a complaint with government action in bringing

criminal charges.  Accordingly, <u>Jones</u> does not control and Defendants' claim for summary

judgment based on the fair reporting privilege is denied.

> E.  *The Legitimate-Business Interest Privilege Does Not Apply*

"Massachusetts courts have recognized that a person may possess a conditional privilege to

publish defamatory material if the publication is reasonably necessary to the protection or

furtherance of a legitimate business interest."  <u>Bratt v. Int'l Bus. Machs. Corp.</u>, 467 N.E.2d 126,

131 (Mass. 1984).  This privilege is generally recognized to apply "where the publisher and the

recipient have a common interest, and the communication is of a kind reasonably calculated to

protect or further it."  <u>Sheehan v. Tobin</u>, 93 N.E.2d 524, 528 (Mass. 1950) (citations omitted).

Accordingly, the privilege has been applied where an employer disclosed its reasons for terminating

an employee, <u>see</u> <u>id.</u>, and where a credit agency issued a report about a firm's financial status to the

firm's potential client, <u>see</u> <u>In re Retailers Commercial Agency, Inc.</u>, 174 N.E.2d 376, 378 (Mass.

1961).  This conditional privilege may be lost if abused, including if "there is 'unnecessary,

unreasonable, or excessive publication,' and the plaintiff establishes that the defendant published

the defamatory information recklessly."  <u>Mulgrew v. City of Taunton</u>, 574 N.E.2d 389, 391 (Mass.

1991) (quoting <u>Bratt</u>, 467 N.E.2d at 132).

Defendants assert that the privilege should apply to the press releases in this instance

because these releases were mandated by TSX, and their publication thus supported a legitimate

business interest.  However, Defendants have not identified any instance in which the privilege

applies to information circulated to the public at large.  <u>See</u> <u>Draghetti v. Chmielewski</u>, 626 N.E.2d

862, 867 (Mass. 1994) ("In those cases in which we have held that an employer has a conditional privilege to make defamatory statements, the statements were published to a narrow group who shared an interest in the communication. In none of the cases did the employer publish the defamatory statements to a newspaper of general circulation."); id. at 867-68 (rejecting a defendant's argument that he shared a "common interest" with the readers of a newspaper because "such a distortion of the meaning of the 'common interest' privilege would create a privilege for virtually all newsworthy statements").

Moreover, even if the privilege did apply to information circulated to the public at large, Defendants have not shown an absence of disputed fact favoring the privilege's application in this case. As explained above, TSX required press releases to inform shareholders and potential investors about Garrison Asia's transfer and about the filing of civil litigation in Canada against Garrison International. The record does not support a finding that TSX controlled the content of the press releases or required that they include information about the alleged Mongolian criminal charges. Even presuming that Defendants had a legitimate business interest in publishing some form of a press release, the inclusion of unnecessary information in that release could constitute abuse of the privilege. Here, a reasonable jury could find that inclusion of information about the alleged criminal charges in Mongolia was beyond the scope of information reasonably required to achieve Defendants' purported legitimate objective.[12] Accordingly, the privilege does not support a grant of summary judgment to Defendants.

### F. Neelon's Evidence of Damages is Sufficient to Survive Summary Judgment

Defendants argue that Neelon has failed to introduce evidence to support his claim that he suffered harm from the allegedly defamatory statements. "Actual injury [compensable in a

---

[12] Given evidence in the record from which a reasonable inference could be drawn that Defendants understood Neelon had not been charged criminally, a reasonable jury could conclude that publication was reckless, thus constituting an abuse of the conditional privilege.

defamation action] includes not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Draghetti, 626 N.E.2d at 868.  Neelon has introduced affidavits regarding his alleged mental distress and reputational harm, and he may testify to those facts at trial.  The Supreme Judicial Court has upheld a jury verdict on a defamation claim based on an individual's testimony "that he was ridiculed by his colleagues, a strong indication that his reputation had been damaged." Id.  Accordingly, the court finds no error in Neelon's reliance on his own testimony at trial to support his claim for damages.  See, e.g., Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.").

Defendants further claim that Neelon has failed to adequately plead special damages. However, under Massachusetts law "the imputation of a crime is defamatory *per se*, requiring no proof of special damages" as an element of the claim.  Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 554 (Mass. 2004); see also Ravnikar, 782 N.E.2d at 511 (holding that "statements that charge the plaintiff with a crime" are "actionable without proof of economic loss"); Bander v. Metro. Life Ins. Co., 47 N.E.2d 595, 598 (Mass. 1943) ("Charges of crime are slanderous and actionable *per se* without proof of special damages.").  Accordingly, even if Defendants are correct that Neelon has not pleaded special damages with specificity (a claim the court need not reach at this time), this is not a ground for summary judgment.[13]

IV.  Chapter 93A (Count III)

Count III of Neelon's complaint is for unfair or deceptive business acts or practices under Chapter 93A.  See First Am. Compl. ¶¶ 102-11 [#18].  Defendants argue that granting summary

---

[13] To recover for discrete economic loss, Neelon will have to quantify that loss and show that it is attributable to the press releases.  That, however, is an issue for trial, not summary judgment.

judgment on Neelon's defamation claims necessitates a grant of summary judgment on this claim as well.  See Defs.' Mem. at 15.  Because the court denies summary judgment on Counts I and II, this argument is moot.  Defendants also argue that the unfair acts giving rise to Neelon's defamation claims did not occur primarily within the Commonwealth.  See id. at 15-16.  Neelon responds that summary judgment is unwarranted because, although the allegedly defamatory press releases were released nationwide, they were focused on Neelon as a Massachusetts resident and were intended to cause him harm in Massachusetts.  See Pl.'s Opp'n at 19-20.

Under Chapter 93A, recovery for unfair or deceptive business acts or practices is limited to those claims in which "the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth."  Mass. Gen. Laws ch. 93A, § 11.   The Supreme Judicial Court has eschewed any precise test to determine whether actions occurred primarily and substantially in the Commonwealth for purposes of section 11.  See Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 781 N.E.2d 787, 798-99 (Mass. 2003).  Rather, the Supreme Judicial Court applies a "center of gravity" analysis, in which the court considers all factors and circumstances giving rise to the unfair business acts or practices claim in light of the "purpose and scope" of Chapter 93A.  Id. at 799.  This determination is "fact intensive and unique to each case."  Id. at 798.  As the party seeking summary judgment, Defendants bear the burden of showing that the alleged unfair business practice in this case did not occur primarily or substantially in the Commonwealth.  See Mass. Gen. Laws. ch. 93A, § 11.

In this case, the press releases were drafted and edited in Mongolia and Canada.  The press releases were then published online from Canada to a multinational audience.  Garrison International stockholders, potential investors, and other wire-service readers received and read the press releases wherever they resided.  Thus, insofar as the press releases were intended to disseminate allegedly false information to readers, the receipt and impact of that unfair practice was

17

not primarily felt in Massachusetts.  Cf. Fishman Tranducers, Inc. v. Paul, 684 F.3d 187, 197 (1st

Cir. 2012) ("[T]he direct impact of the deception—to the extent it occurred—was on customers all

over the country, few of whom were in Massachusetts.").

While reputational harm to Neelon may have been a byproduct of this unfair or deceptive

business practice, that harm did not arise from a commercial transaction between Neelon and

Defendants, and there is no evidence that Defendants targeted the Massachusetts marketplace or

Massachusetts consumers.  See Manning v. Zuckerman, 444 N.E.2d 1262, 1264-65 (Mass. 1983)

("The Legislature originally enacted c. 93A to . . . encourage more equitable behavior in the

marketplace. . . .  The development of the statute . . . suggests that the unfair or deceptive acts or

practices prohibited are those that may arise in dealings between discrete, independent business

entities . . . .").  Here, the allegedly unfair act includes Defendants' purported attempt to regain

ownership of Garrison Asia (a Mongolian company) from Cohen (a Canadian citizen).  This act has

no direct effect or primary focus on the Massachusetts market.  Cf. In re Pharm. Indus. Average

Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009) (allowing section 11 claim to proceed

based on conduct which had an effect on pricing in the Massachusetts market because claim was

"undoubtedly consistent" with Chapter 93A's focus on incentivizing equitable marketplace

transactions).

This is not to say that Defendants did not intend harm from the press releases to be felt by

Neelon in Massachusetts.  To the contrary, there is evidence in the record sufficient for a reasonable

jury to find that Defendants intended Neelon to feel the impact of these press releases in this forum.

Such intentionality, however, does not necessarily make Massachusetts the "center of gravity" of

the allegedly unfair acts in question.  Neelon conceded at oral argument that the unfair act of

publishing the press releases was equally focused at harming Cohen.  Accordingly, while harm in

Masschusetts may have been intentional, Defendants' alleged intent to harm was not primarily

focused on Massachusetts.  See Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st

Cir. 2005) ("[I]f the significant contacts of the competing jurisdictions are approximately in the

balance, the conduct in question cannot be said to have occurred primarily and substantially in

Massachusetts.").

For the foregoing reasons, the court finds that the center of gravity of the alleged unfair or

deceptive business acts or practices is not Massachusetts.  See Fishman, 684 F.3d at 197 ("Where

wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the

country, the 'primarily' requirement of section 11 cannot be satisfied.").  Defendants' motion for

summary judgment as to Count III of Neelon's amended complaint is allowed.

V.      Personal Jurisdiction

Defendants argue that summary judgment is warranted because no facts in the record

support a finding of personal jurisdiction under the Massachusetts long-arm statute or the Due

Process Clause.  See Defs.' Mem. at 16-17.  In opposition, Neelon asserts that the court's previous

order on personal jurisdiction constitutes law of the case.  See Pl.'s Opp'n at 20.

Neelon's argument that the issue of personal jurisdiction has been finally resolved is

incorrect.  The court's prior order found personal jurisdiction over Defendants under the *prima facie*

standard.  See Mem. & Order Defs.' Mot. Dismiss 7 [#43] [hereinafter Jurisdiction Mem.].  A

finding of personal jurisdiction under the *prima facie* standard is "an implicit deferral until trial of

the final ruling on [personal] jurisdiction." Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 678 (1st Cir.

1992).  Accordingly, the issue is not foreclosed at trial, and the law-of-the-case doctrine will not be

implicated by the court's prior order once the case reaches trial.  See id. (stating that resolution

under the *prima facie* standard "avoids . . . issues of . . . 'law of the case'").  During the pretrial

period, however, the court continues to assess personal jurisdiction under the *prima facie* standard.

Accordingly, the court treats Defendants' argument as a motion for reconsideration.

The Supreme Judicial Court has held that the Massachusetts long-arm statute is at least coterminous with constitutional limits on personal jurisdiction.  See, e.g., "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 280 N.E.2d 423, 424 (Mass. 1972) ("We see the function of the long arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.").  The First Circuit, in turn, has directed district courts assessing personal jurisdiction that they may "sidestep the statutory inquiry and proceed directly to the constitutional analysis." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002); see also Evans Cabinet Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 146 (1st Cir. 2010).  Accordingly, the court need not treat Defendants' arguments that are specific to the long-arm statute.

As to the constitutional limits of jurisdiction, Defendants argue that there is no evidence in the record that they purposefully availed themselves of the Massachusetts forum.  Rather, according to Defendants, they issued the press releases from Canada and only issued the press releases because they were required to do so by TSX.  As explained above, record evidence does not support the claim that TSX controlled the content of the press releases or mandated the inclusion of language identifying Neelon as a member of the Massachusetts bar.  Moreover, Defendants' argument ignores that the court cited record evidence in support of its prior finding of personal jurisdiction under the *prima facie* standard.  Namely, the court considered: (1) a statement by Defendant Krueger that he intended to report Neelon to the "Massachusetts Bar Association," and (2) the statement in Defendants' September 23, 2011 press release identifying Neelon as a "member of the Massachusetts Bar Association."  See Jurisdiction Mem. at 11; Aff. Blair Krueger Supp. Mot. Dismiss, Ex. B [#14-4]; Decl. Pl. Supp. Opp'n Defs.' Mot. Dismiss Compl., Ex. 9 [#29-9].

Reconsideration of the court's order on personal jurisdiction is denied.  At trial, Neelon will bear the burden of showing personal jurisdiction to a preponderance of the evidence.  See Boit, 967 F.2d at 677.

VI.     Conclusion

Defendants' Motion for Summary Judgment [#321] is DENIED as to Counts I and II (Defamation and Defamation *Per Se*) of Neelon's complaint, and ALLOWED as to Count III (Mass. Gen. Laws ch. 93A).

IT IS SO ORDERED.

July 30, 2015                                                    /s/ Indira Talwani
                                                                United States District Judge