UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL P. NEELON, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 12-cv-11198-IT |
| BLAIR KRUEGER and DESERT EAGLE | * |
| RESOURCES, LTD. f/k/a GARRISON | * |
| INTERNATIONAL, LTD., | * |
| | * |
| Defendants. | * |
| ************************************ | |
| BLAIR KRUEGER and DESERT EAGLE | * |
| RESOURCES, LTD. f/k/a GARRISON | * |
| INTERNATIONAL, LTD., | * |
| | * |
| Counterclaim Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| DANIEL P. NEELON, | * |
| | * |
| Counterclaim Defendant. | * |

MEMORANDUM & ORDER

August 5, 2015

TALWANI, D.J.

I.  Introduction

In late 2010, Garrison Asia, Ltd. ("Garrison Asia") and its then-parent company, Garrison International ("Garrison International"),[1] acting through their CEO and Director, Defendant Blair Krueger ("Krueger"), entered into a loan agreement with Georges Cohen ("Cohen"). Plaintiff Daniel Neelon ("Neelon"), a Massachusetts attorney, drafted the loan agreement. The loan agreement included a default and remedy provision stating that, upon a default of the loan's terms,

---

[1] Garrison International is the former name of Defendant Desert Eagle Resources, Ltd.

the ownership of Garrison Asia would transfer away from Garrison International and to Cohen. Soon after the loan agreement was signed, ownership of Garrison Asia was transferred. Garrison International and Krueger now bring a claim against Neelon for the fraudulent conversion of: (1) Garrison Asia's tangible property, and (2) the Garrison Asia shares owned by Garrison International. See Defs.' Counter Claim Against Pl. [#50] [hereinafter Counterclaim].

Before the court is Neelon's Motion for Summary Judgment of Defendants' Counterclaim [#324]. For the reasons set forth below, the court ALLOWS this motion and grants summary judgment in favor of Neelon.

II.     Choice of Law

Both parties' summary judgment papers apply Massachusetts law to Defendants' conversion claim. See Pl.'s Mem. Supp. Mot. Summ. J. Defs.' Counterclaim [#325] [hereinafter Pl.'s Mem.]; Defs.' Opp'n Pl.'s Mot. Summ. J. Defs.' Counterclaim [#331] [hereinafter Defs.' Opp'n]. Because the alleged conversion occurred in Mongolia, the court ordered the parties to file a statement as to why they assert Massachusetts law governs this claim. See Order [#358].

Defendants suggest that Massachusetts law applies because their counterclaim for conversion is compulsory. See Defs.' Resp. Court Order Dated July 15, 2015 [#359] [hereinafter Defs.' Choice of Law]. Without deciding whether Defendants' counterclaim is indeed compulsory or merely permissive, the court notes that Defendants offer no authority for the assumption that the court could not apply foreign law to a counterclaim.

Neelon asserts that Massachusetts law applies because both parties argued the claim under Massachusetts law in their prior filings with the court. See Pl.'s Resp. Court's July 15, 2015 Order Regarding Law Governing Defs.' Conversion Counterclaim [#360] [hereinafter Pl.'s Choice of Law].

2

Massachusetts choice-of-law rules allow the court to consider the factors articulated in section 6 of the Restatement (Second) of Conflicts of Laws (1971). See Bushkin Assocs. v. Raytheon Co., 473 N.E.2d 662, 669 (Mass. 1985). One factor articulated in section 6 is "ease in the determination and application of the law to be applied." The court interprets the parties' arguments related to the application of Massachusetts law as an assertion that Massachusetts law should apply because of its ease of application in light of the Massachusetts forum and the parties' briefs. Accordingly, the court finds the parties' choice of law plausible and applies Massachusetts law to Defendants' claim for conversion. See Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010) (holding parties to "their plausible choice of law, whether or not that choice is correct").[2]

III.     Summary Judgment Standard

Summary judgment is appropriate where the movant shows that there are no genuine disputes of material fact and summary judgment is warranted as a matter of law. See Fed. R. Civ. P. 56(a). A fact is material if it "has the potential to change the outcome of the suit under the governing law." Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995). A material fact is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the summary judgment movant "invoke[s] Rule 56 and assert[s] a lack of supporting evidence, the . . . [nonmovant] must establish the existence of a triable issue which is both genuine and material to his claim." Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993). As to elements of that claim for which the nonmovant will bear the ultimate burden of proof at trial, the nonmovant

---

[2] The parties agree further that the Secured Promissory Note's choice-of-law provision requires application of Mongolian law to any question requiring interpretation of the Secured Promissory Note's terms. See Def.'s Choice of Law at 1; Pl.'s Choice of Law at 1-2. However, neither party has pointed to any term of the Secured Promissory Note that requires interpretation. Further, neither party has submitted to the court any sources reflecting the content of Mongolian law concerning interpretation of the terms of the contract.

must offer more than "merely colorable" evidence. Id. (quoting Anderson, 477 U.S. at 249-50). "[D]efinite, competent evidence" is required. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

IV.     Discussion

Defendants allege that Neelon converted: (1) Garrison Asia's mining licenses, labor contracts, geological reports, company stamp, and Land Cruiser; and (2) the Garrison Asia shares owned by Garrison International. See Defs.' Opp'n at 2-4.

Under Massachusetts law, to prove a claim for conversion in this case, each Defendant bears the burden of showing that: (1) he or it "had an ownership or possessory interest in the [allegedly converted property] at the time of the alleged conversion"; (2) Neelon "intentionally and wrongfully exercised control or dominion over" the owned property; and (3) damages resulted from Neelon's conduct. Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).[3]

    A.    *Krueger's Claim for Conversion*

Throughout the time period relevant to this case, Krueger was employed as President and CEO of Garrison International. Counterclaim ¶ 1; Pl.'s Answer Defs.' Counterclaims ¶ 1 [#58]. Krueger further appears to have served as "Director, President, CEO, and Executive Director" of Garrison Asia. See, e.g., Aff. Blair Krueger Supp. Mot. Dismiss Basis Forum Non-Conveniens, Exs. 1, 6 [#331-1] (showing documents signed by Krueger on behalf of Garrison Asia). Krueger presents no evidence that, during this time period, he had an ownership interest either in Garrison Asia's tangible property or in the ownership shares of Garrison Asia.

---

[3] In cases where a defendant had legitimate possession of property, for example, a bailee holding goods for a bailor, Massachusetts law recognizes a further element that requires the plaintiff to have requested the property's return and been denied. See Evergreen Marine Corp., 4 F.3d at 95; see also Atl. Fin. Corp. v. Galvam, 39 N.E.2d 951, 952 (Mass. 1942).

Insofar as Krueger acted as Director, CEO, President, and Executive Director of Garrison Asia, these roles did not give him an independent interest in Garrison Asia's tangible property. Any control Krueger exercised over that property was not as an owner, but as a corporate employee acting on behalf of the corporation. Krueger acknowledges that the tangible property in question was held by Garrison Asia as a corporate asset. See, e.g., Defs.' Opp'n at 1 (asserting that "evidence shows Mr. Neelon wrongfully converted other *Garrison Asia* property" (emphasis added)). Krueger has not suggested that he brings this claim in the name of Garrison Asia (or that he could properly do so), and there are no facts in the summary judgment record from which a reasonable jury would find that Krueger possessed an individual interest in Garrison Asia's tangible property.

Krueger has also not presented any evidence that he had an ownership or possessory interest in the shares of Garrison Asia owned by Garrison International. Krueger's employment with Garrison International does not raise a reasonable inference that Krueger had an interest in the shares of Garrison Asia, and Krueger has not presented evidence that he is a Garrison International shareholder. Moreover, even presuming that Krueger owned Garrison International shares at the time of the alleged conversion, "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporations' assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003).

Accordingly, Neelon is entitled to summary judgment on Krueger's claim of conversion. See MacNeil v. Hazelton, 28 N.E.2d 477, 478 (Mass. 1940) ("In an action for conversion the plaintiff has the burden of proving his ownership, general or special, of the article involved, at the time of the alleged conversion. . . .").

B.   *Garrison International's Claim for Conversion*

      1.   Claim for Conversion of Garrison Asia's Tangible Property

"A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." Dole Food, 538 U.S. at 475; Unilever Home & Personal Care USA v. P.R. Beauty Supply, Inc., 162 F. App'x 22, 25 (1st Cir. 2006) (unpublished opinion) (same); see also Sherwin-Williams Co. v. Comm'r of Revenue, 778 N.E.2d 504, 517 (Mass. 2002) (recognizing that parent company's sale of trademarks to its subsidiary meant that "[i]t no longer owned the marks" and holding that "[t]he separate corporate identities . . . must be respected . . . regardless of [parent company's] stock ownership").[4]

Accordingly, Garrison International's role as Garrison Asia's sole shareholder did not create an ownership interest in the tangible property of its subsidiary. In the absence of any facts supporting a finding that Garrison International had an ownership interest in Garrison Asia's tangible property (*i.e.*, mining licenses, labor contracts, geological reports, the company stamp, and the company vehicle), summary judgment is warranted on Garrison International's conversion claim insofar as it relates to this property. See MacNeil, 28 N.E.2d at 478.

      2.   Claim for Conversion of the Shares of Garrison Asia

Neelon asserts that he cannot be held liable in conversion because he never gained ownership or control over the Garrison Asia shares. See Pl.'s Mem. at 4-5. Garrison International concedes that Neelon never owned or controlled the shares of Garrison Asia that it alleges he converted. See Defs.' Opp'n at 4-5. Garrison International asserts, however, that Neelon may be found liable for converting those shares, despite never gaining ownership or control of them, so long as he acted to deprive Garrison International of its rightful ownership interest. Id.

---

[4] Defendants bring no argument that the presumption of corporate separateness should not apply in this case.

Under Massachusetts law, participation in a scheme to deprive the rightful owners of property may suffice to state a claim for conversion, even if the accused party does not retain ownership or control over the property.  See Kelley v. LaForce, 288 F.3d 1, 12 (1st Cir. 2002) ("Although defendants may not have acted with the intent to appropriate the appellants' personal property for themselves, appellants offered evidence to show that the defendants acted with the intent to deprive the alleged owners of their property."); Strickland v. Barrett, 37 Mass. 415, 417 (1838) ("[W]here two or more unite to do a tortious act, all are principals and jointly liable.  If he was brought within this principle, by proof of a confederacy with Hill, then Hill's conversion was his conversion.").  Intent to deprive Defendants of their property, however, is not sufficient to show conversion absent evidence of a *wrongful act* furthering the deprivation.  This is because "[a]n action for conversion cannot be maintained without proof that the defendant either did *some positive wrongful act* with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property."  Kelley, 288 F.3d at 12 (emphasis added) (citations and internal quotation marks omitted); see also Spooner v. Manchester, 133 Mass. 270, 273 (1882) (quoting Spooner v. Holmes, 102 Mass. 503, 506 (1869)).

Garrison International asserts that Neelon engaged with Cohen in a scheme to deprive Garrison International of its ownership interest in the shares of Garrison Asia.  According to Garrison International, the first stage of this scheme began with Neelon's drafting of loan agreement.  Garrison International asserts that the terms of this loan agreement, coupled with contemporaneous written and oral statements by Cohen that induced Garrison International to default under the loan, show that Neelon intended to deprive Garrison International of its ownership in the Garrison Asia shares.[5]

---

[5] Garrison International alleges that this scheme continued through at least March 2011.  Guided by the requirement that a plaintiff alleging that conversion occurred must show that it had an

7

        a.   The Secured Promissory Note and Related Documents

In November 2010, Garrison International and Garrison Asia entered into the loan agreement with Cohen pursuant to which Cohen loaned the parent company and its subsidiary $210,000 CAD. See Secured Promissory Note [#108-3] [hereinafter Note]; Pl.'s L.R. 56.1 Statement Material Facts ¶¶ B(19)-(20) [#326] [hereinafter Pl.'s Facts]; Defs.' Resps. Pl.'s Statement Material Facts ¶¶ B(19)-(20) [#332] [hereinafter Defs.' Resps.]. Neelon drafted the relevant documents and negotiated this transaction on behalf of Cohen. See Defs.' Concise Statement Material Facts Record Show Genuine Issue Tried Counterclaim ¶ 1 [#333] [hereinafter Defs.' Addt'l Facts]; Pl.'s Reply Defs.' Concise Statement (Alleged) Material Facts Record Show Genuine Issue Tried Counterclaim ¶ 1 [#346] [hereinafter Pl.'s Reply].

The documents drafted by Neelon included: (1) a "Secured Promissory Note," (2) a "Garrison Asia LLC Sole Shareholders' Resolution," (3) a "Share Transfer Agreement," and (4) an "Irrevocable Stock Transfer Power" agreement. See Aff. Blair Krueger Supp. Mot. Dismiss Basis Forum Non-Conveniens, Exs. 1, 3-5 [#108-2].

The Secured Promissory Note was signed and dated by Krueger and Garrison Asia's Chief Operating Officer, Anthony Bainbridge ("Bainbridge"), on behalf of both Garrison International and Garrison Asia and was stamped with the Garrison Asia company stamp. See Note at 8-9. Under the Secured Promissory Note, Garrison Asia (which was the "Maker") represented and warranted how the loan proceeds would be used. Namely, Garrison Asia warranted that "$150,000 of the $210,000 principal amount of this Note shall be used to pay $150,000 in aggregate interest payments due in December 2010 on debentures owed by Maker's parent company, Garrison

---

ownership interest in the property allegedly converted at the time of the conversion, the court first considers the facts predating the transfer of ownership.

International Ltd., and that the remaining $60,000 shall be used to fund the direct costs of mining operations." See Note ¶ 1.  The Note provided further that a Default would occur

> immediately upon the occurrence of any of the following: (1) Maker fails to pay when due any interest installment or principal payment to come due under this Note; (2) Maker or its parent company, Garrison International Ltd., or any subsidiary fails to timely pay any interest or principal amount or other payment due or to become due under any promissory note, debenture, contract, or other obligation by which Maker or such parent or subsidiary is bound, or Maker or its parent company or any subsidiary breaches any non-monetary obligations under any contract or other obligation by which it is bound.

Id. ¶ 7(A).

According to Garrison International, Krueger and Bainbridge believed that the Note included a requirement that notice be provided of any default of the Note's terms.  See Defs.' Addt'l Facts ¶ 9.  The Note itself, however, provided for an immediate remedy in the event of a default without a notice requirement.  Namely, the Note stated that, upon default, "the payment due date for all outstanding principal and interest under this Note shall be immediately and automatically accelerated to 24 hours."  Note ¶ 7(C).   The Note further provided that "at 72 hours after the occurrence of any Default, Payee (or its nominee, if any) shall become the sole, irrevocable and absolute owner of all of the Shares automatically and without any further action needed."  Id. ¶ 6.[6] The Note's only provision related to notice stated that such notice "may" be given by Cohen "at [his] sole option" and, moreover, that "[n]o failure or delay in giving any such optional notice of Default will impair, limit or delay Payee's rights and remedies for the Default."  Id. ¶ 7(B).

---

[6] The Note provided that "[a]t any time 72 hours or more after any Default, Payee [Cohen] or its designated attorney or other agent may date and obtain the Certificate [of Foreign Incorporated Company #07-162] (on which it may fill in the name of the transferee above the endorsement of Anthony Bainbridge as COO) and the Share Transfer Agreement and use either or both documents as proof of Payee's ownership of the Shares."  Note ¶ 6.  It also stated that "even if Payee or its designated attorney or agent fails to date or obtain the Certificate or the Share Transfer Agreement," Cohen would still automatically take ownership.  Id.

Two provisions in the Note further provided that, if a default occurred, "the deemed purchase price for the Shares shall be $70,000 (Cdn), which shall be credited against amounts due under this Note." Id. ¶ 6; see also id. ¶ 7(D) ("[I]f a Default occurs and continues for 72 hours after it commences, then, in addition to any and all other rights and remedies that Payee may have under this note and/or applicable law, Payee (or its nominee, if any) shall become the sole, irrevocable and absolute owner of all the Shares for the sum of $70,000 (Cdn.) . . . .").

Finally, the Note provided that "Maker hereby irrevocably waives presentment, notice of presentment, demand, dishonor, notice of dishonor, notice of intent to accelerate, notice of acceleration and any and all other demands and notices as a prerequisite to Maker's obligation to pay Payee in accordance with this Note or to Payee's right to exercise all of its rights and remedies under this Note, under the Bill of Sale and Assignment, under the Share Transfer Agreement, and under applicable law in the event of a Default." Id. ¶ 10.

Neelon drafted a second document, the Garrison Asia LLC Sole Shareholder's Resolution, which stated that: "the Company [Garrison Asia] and the Shareholder [Garrison International] are obligated under the Secured Promissory Note . . . to transfer 100% of the issued shares of the Company, a Mongolian legal entity. . . . [I]t is hereby[] RESOLVED that Shareholder, acting through the Company, shall transfer all the issued shares of Shareholder (that being 10,000 common shares) of the Company to Georges H. Cohen." See Garrison Asia LLC Sole Shareholder's Resolution [#108-7]. This agreement was signed by Krueger and Bainbridge on behalf of Garrison International and Garrison Asia, stamped with the Garrison Asia company stamp, and dated November 22, 2010. See id.

A third document drafted by Neelon, the Share Transfer Agreement, stated that "[f]or Value Received, Garrison International Ltd. . . . hereby assigns and transfers 10,000 common shares . . . , which is 100% of all authorized and issued shares of Garrison Asia LLC . . . to: . . . Georges H.

Cohen." Share Transfer Agreement [#108-5]. This document was signed by Krueger and Bainbridge on behalf of Garrison International and stamped with the Garrison Asia stamp, but was not dated. See id. The Secured Promissory Note gave Cohen or his agent the right to later date the Share Transfer Agreement if a default occurred. See Note ¶ 6.

> Neelon drafted a final document, the Irrevocable Stock Transfer Power, which stated that:
>
> Garrison International Ltd. . . . hereby irrevocably makes, constitutes and appoints Georges Cohen or Daniel P. Neelon (either of whom may act without the other's participation) to be [Garrison] International's attorney-in-fact to transfer ownership of all 10,000 of the issued and outstanding shares of stock in Garrison Asia LLC . . . to Georges Cohen . . . . The above-named attorneys-in-fact shall have no express or implied duties of obligations to [Garrison] International of any kind, but each has and shall have full power and authority from [Garrison] International to effectuate the change of record ownership of all issued and outstanding shares of stock in Garrison Asia. . . . [Garrison] International acknowledges that it has sold the Garrison Asia Shares, being 100% of all ownership interests and rights in Garrison Asia, to Georges H. Cohen for the sum of $70,000 (Cdn) . . . .

See Irrevocable Stock Transfer Power [#108-6]. This document was signed by Krueger on behalf of Garrison International and stamped with the Garrison Asia stamp. See id. This document was not dated, see id., and the Secured Promissory Note does not give Cohen or his agent express authority to add a date to this document at a later time, see Note; Defs.' Addt'l Facts ¶ 22. However, the Note states that the Irrevocable Stock Transfer Power shall be attached to the Certificate of Foreign Incorporated Company, and the Note expressly provides that this certificate may be dated upon the occurrence of a default. See Note ¶ 6; Pl.'s Reply ¶ 22(b).

It appears undisputed that the Document Management Agreement, Share Transfer Agreement, and Irrevocable Stock Transfer were to be held in escrow until any default occurred. See Document Management Agreement, art. 1 [#108-8] (agreement stating that the documents associated with the loan agreement would be held in trust); Pl.'s Facts, Ex. 6 [#326-10] (correspondence from Krueger to Neelon suggesting that there be "a set of tranfer [sic] forms for the 10,000 shares held in escrow"). As further evidence of Neelon's alleged intent to deprive

Garrison International of its property, Garrison International points to a November 23, 2010 e-mail from Neelon to the Mongolian law firm of Lehman, Lee & Xu to which he attached the documents related to the loan agreement and stated that Lehman, Lee & Xu should hold those documents "until receipt of further instructions from Georges H. Cohen or myself on his behalf." See Aff. Damian R. LaPlaca Supp. Defs.' Opp'n Pl.'s Mot. Summ. J. Defs.' Counterclaim, Ex. 14 at 1 [#331-34]. Specifically, Garrison International points to Neelon's statement that future instructions "may include, without limitation, immediately dating and filing the Share Transfer Agreement and procuring a new certificate evidencing Georges H. Cohen's ownership of all issued and outstanding shares of Garrison Asia LLC." See id. at 2.

  Even assuming that a reasonable jury could find that Neelon's intent in drafting the loan agreement was to obtain the Garrison Asia shares, Garrison International offers no facts suggesting that Neelon's acts were wrongful. Garrison International does not argue, for example, that the agreement was anything less than an arm's length deal. To the contrary, Garrison International concedes that it engaged Mongolian and Canadian counsel to provide legal advice related to the loan documents. Pl.'s Facts ¶ 21; Defs.' Resps. ¶ 21. Further, Garrison International has presented no evidence that Neelon misrepresented the terms of the Note, impeded Garrison International's independent review of the Note, or otherwise induced Garrison International into signing loan terms they did not understand. Rather, Garrison International conceded at oral argument that Krueger, not Neelon, came up with the idea for a default remedy provision that provided for the transfer of ownership shares in Garrison Asia. See Pl.'s Facts, Ex. 6 (e-mail from Krueger suggesting "a set of tranfer [sic] forms for the 10,000 shares held in escrow").

  As to Neelon's e-mail to Lehman, Lee & Xu, it is undisputed that this e-mail forwarded copies of the documents signed in relation to the loan agreement and requested that the firm hold these documents until receipt of further instructions. It is further undisputed that the potential

action described in the e-mail (namely, transfer as a result of default) is expressly provided for in the Secured Promissory Note. See Note ¶¶ 6-7.

In light of these undisputed facts, Garrison International has not identified facts related to Neelon's role in drafting this loan agreement or sending the e-mail that give rise to a reasonable inference that Neelon engaged in a wrongful act as part of a scheme to obtain the shares of Garrison Asia. See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005) ("[O]nly a defendant that '*wrongfully* excercises acts of ownership' has committed conversion" (quoting In re Halmar Distribs., Inc., 968 F.2d 121, 129 (1st Cir. 1992)). Whatever Neelon's intent in drafting the Note, Garrison International has presented no evidence of acts occurring outside of the arm's length negotiation of a loan agreement. See In re Citigroup, Inc., Capital Accumulation Plan Litig., 652 F.3d 88, 92 (1st Cir. 2011) ("[T]he actions that the appellees took allegedly depriving the appellant of ownership or control of their property were done in accordance with the . . . contract, and thus were not wrongful.").[7]

      b. Cohen's Oral Statements and Garrison International's Default

In further support of its claim that Neelon engaged with Cohen in a scheme to take ownership of Garrison Asia, Garrison International presents evidence that Cohen verbally told Bainbridge and Krueger not to use the loan proceeds for the purposes stated in the Secured Promissory Note. See Aff. Anthony Bainbridge ¶¶ 13-14 [#331-4] [hereinafter Bainbridge Aff.]. For the purposes of the present motion, the court accepts as true Garrison International's assertion that these statements were made. See Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.").

---

[7] Although In re Citigroup, 652 F.3d at 92, assessed conversion claims under Louisiana and Colorado law, Massachusetts law also requires a *wrongful* act depriving an owner of property to state a claim for conversion. See Mass. Eye & Ear Infirmary, 412 F.3d at 230.

However, Garrison International has presented no evidence or argument that this oral statement acted as a modification to terms of the Note. Moreover, the Note included language forbidding oral modification, namely, "[t]his Note, together with the Bill of Sale and Assignment and the Share Transfer Agreement, contains the entire agreement of the Maker and Payee concerning the subject matter of this Note. This Note may not be amended or modified except by a written document signed by Maker and Payee." Note ¶ 18.

Garrison International also proffers a document initialed by Cohen, Krueger, and Bainbridge that Garrison International contends is an operating budget for the Tovshir Gold [Mining] Project. See Defs.' Addt'l Facts ¶ 10; Bainbridge Aff. Ex. 1 [#331-5] (copy of budget). According to Garrison International, this budget reallocated the loaned money away from the purposes set forth in the Secured Promissory Note to the costs of trucking ore between Garrison Asia's Tovshir mine and another Mongolian mine operated by Bainbridge. See Defs.' Addt'l Facts ¶ 11; Bainbridge Aff. ¶¶ 13-14. Although a writing, this budget on its face does not purport to modify the Secured Promissory Note and, indeed, makes no mention at all of the Note. Accordingly, notwithstanding Cohen's verbal statements and the Tovshir budget, Garrison International has presented no evidence from which a reasonable jury could find that Garrison International's loan obligations under the Secured Promissory Note were modified after the parties entered into that agreement.

Garrison International does not dispute that it did not timely pay interest due, as of December 31, 2010, on a $500,000 debenture owed to Forbes & Manhattan, Inc. and three other debentures. Pl.'s Facts ¶ C(7), (9); Defs.' Resps. ¶ C(7), (9). Further, Garrison International does not dispute that, under the written terms of the Secured Promissory Note, a failure by Garrison Asia or Garrison International "to pay timely any interest or principal amount or other payment due or to become due under any promissory note, debenture, contract or other obligation by which Maker or such parent or subsidiary is bound" was a default. See Note ¶7(A); Pl.'s Facts ¶ C(8); Defs.' Resps.

¶ C(8). Accordingly, it appears undisputed that, under the terms of the Note, default occurred at least as of December 31, 2010.

Garrison International asserts that their non-compliance with the express terms of the Secured Promissory Note was a result of reliance on Cohen's statements regarding alternative uses of the funds as well as the Tovishir budget. Defs.' Resps. ¶ C(8). However, as stated above, the Note's express terms barred oral modifications and nothing in the Tovishir budget identifies it as a modification to the Note's terms. Because there is no evidence from which a reasonable jury could find that the Note's terms had been modified, there is no evidence from which a reasonably jury could determine that non-payment of the owed interest payments was not a default under the Note.

As stated above, the Note includes a term expressly holding that seventy-two hours after a default on the note's terms, "Payee . . . shall become the sole, irrevocable and absolute owner of all of the Shares automatically and without any further action needed. In that case, the deemed purchase price for the Shares will be $70,000 (Cdn.)." Note ¶ 6. Accordingly, under the terms of a contract signed after arm's length dealing and on advice of independent counsel, Garrison International's default on the loan terms resulted, seventy-two hours later, in the automatic sale of any legal interest it had in the shares of Garrison Asia to Cohen for the price of $70,000 CAD.[8]

Any acts taken at or after the end of this seventy-two hour default period (which appears to have run by January 3, 2011, but in any case, prior to January 10, 2011) that resulted in depriving Garrison International of control over the shares of Garrison Asia were not *wrongful*. Rather, these acts were taken in accordance with terms of the Note. Because the transfer of ownership occurred

---

[8] Garrison International's argument that they subjectively believed notice was required does not rebut this finding given the express contrary terms of the Note. Moreover, although Garrison International asserted at oral argument that there is a Mongolian law requiring such notice, Garrison International has not provided that law to the court. Garrison International further does not explain how that law would apply in light of the Note's express waiver of notice requirements under "any applicable law." Note ¶ 10.

in accordance with the parties' loan agreement, and following an undisputed default of that agreement, this transfer was not an act of conversion. See In re Citigroup, 652 F.3d at 92.[9]

### c. The Subsequent Actions

Garrison International describes various actions occurring from January 10 through March 2011 that it argues form the later stages of Neelon's scheme to convert the shares of Garrison Asia away from Garrison International. For example, in late January 2011, Neelon took Garrison Asia's company stamp from the Garrison Asia office on one or more occasions. See Rule 56(g) Order [#371]. Sometime between January 10 and January 26, 2011, someone used that stamp to stamp a new corporate charter that showed Cohen as Garrison Asia's owner.[10] Ariunna Tsogt ("Tsogt"), a paralegal at Lehman, Lee & Xu and later Neelon's personal assistant, filed that new corporate charter, the Irrevocable Stock Transfer, and the Share Transfer Agreement with the Mongolian Foreign Investment and Foreign Trade Agency on February 1, 2011,[11] and with the Mongolian Legal Entity Registration Office on February 9, 2011.[12] Before filing these documents, someone added the date of "January 10, 2011" to the Share Transfer Agreement and the Irrevocable Stock Transfer, which had previously been undated, and then had these documents notarized as a "True

---

[9] If Cohen's November statements did occur, Garrison International may well have been lulled into the false sense that it need not worry about the default. And if Neelon knew about, intended, or participated in the making of these oral statements, he may have played a role in that false sense of security. Such facts, if established, would be troubling. They would not, however, give rise to a claim of conversion where transfer occurred in accordance with a legal contract under which oral modifications were expressly prohibited.

[10] Compare Defs.' Addt'l Facts ¶ 28 (Cohen or someone on Cohen's direction stamped the charter), with Decl. Georges Cohen Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. ¶ 24 [#334-53] (Krueger stamped the charter).

[11] See Defs.' Addt'l Facts ¶ 37; Pl.'s Reply ¶ 37.

[12] See Defs.' Addt'l Facts ¶ 39; Pl.'s Reply ¶ 39.

and Correct copies" of the original document without informing the notary that the date had been added later.[13]

Neelon's role in the above actions is genuinely disputed. However, these actions are immaterial to Garrison International's claim for conversion. Under the express terms of the Secured Promissory Note, Garrison International ceded any legal interest it held in the ownership of the Garrison Asia shares automatically three days after default. See Note ¶ 6 ("72 hours after the occurrence of any Default, Payee . . . shall become the sole irrevocable and absolute owner of all of the Shares automatically and without any further action needed."); id. ¶ 7(D) ("[If] a Default occurs and continues for 72 hours . . . Payee . . . shall become the sole, irrecovable and absolute owner of all of the Shares for the sum of $70,000 (Cdn.), which shall be credited as paid against this Note . . . ."). Accordingly, pursuant to the party's contractual agreement, acts occurring more than three days after the undisputed default cannot have disrupted Garrison International's exercise of its legal ownership rights. Garrison International no longer had such rights.

Garrison International argues that the acts of stamping, notarizing and filing documents with Mongolian authorities was required to transfer ownership (such that it retained ownership until these acts were correctly completed). This argument, however, is not supported by competent evidence sufficient to rebut the express terms of the parties' contractual agreement. Garrison International relies on a statement by Neelon, made to a Mongolian prosecutor in May 2011, that "[a]s of February 1, 2011, the first stage of transferring the shares into George's [sic] name as authorized by the Note and Share Transfer Agreement, was completed. . . . As of February 9, 2011, the final stage of transferring ownership of the shares into Georges' name was done." Aff. Batbuyan Sodnomjamts, Ex. A [#331-18]. Although this statement bears on how and when Cohen completed the process of registering his ownership interest with Mongolian authorities, it does not

---

[13] See Defs.' Addt'l Facts ¶¶ 21, 30; Pl.'s Reply ¶¶ 21, 30.

show that Garrison International retained any ownership of the shares more than seventy-two hours after default. The express terms of the Secured Promissory note hold that seventy-two hours after default Cohen automatically gained ownership of the shares, which were held to have been sold at a value of $70,000 CAD credited against the Note. Consequently, this is the moment at which Garrison International lost any right to assert ownership over those shares, which were deemed to have been sold. Later acts, whether necessary steps to inform Mongolian authorities of the change in ownership or not, are not evidence of conversion. [15]

V.     Conclusion

Defendants have failed to offer evidence to establish the elements of their claim for conversion for which the nonmovant will bear the ultimate burden of proof at trial. Accordingly, Neelon's Motion for Summary Judgment of Defendants' Counterclaim [#324] is ALLOWED.

IT IS SO ORDERED.

August 5, 2015                                                                 /s/ Indira Talwani
                                                                               United States District Judge

---

[15] According to Garrison International, throughout March 2011, Neelon also sought and received confidential Garrison Asia information from Bainbridge regarding Garrison Asia's mining operations and potential development sites while taking acts intended to make Bainbridge believe Garrison Asia's ownership had not been transferred. Defs.' Addt'l Facts ¶¶ 47-49, 61. Even accepting these facts as true, the information sought and received was held by Garrison Asia, not Garrison International. Accordingly, Garrison International cannot assert an ownership interest in this property and therefore cannot rely on these actions for its own conversion claim.

Garrison International further asserts that, when it sought return of the shares in March 2011, Neelon sent an email indicating that Cohen "will leave open his offer to sell the Garrison Asia shares and his shares in Garrison International for $3.0 million." Id. ¶¶ 62-63. Garrison International argues that this statement amounted to extortion, but does not dispute that Cohen and businesses with which Cohen was associated had ownership interests in Garrison Asia and Garrison International valued at more than three million dollars. Pl.'s Facts ¶ C(4); Defs.' Resps ¶ C(4). Moreover, Garrison International concedes that Neelon never had control over the Garrison Asia shares. See Magaw v. Beals, 172 N.E. 347, 349 (Mass. 1930) ("When the plaintiff relies upon demand [for return of property] and refusal as independent and basic evidence of conversion, it must appear that at the time of the demand and refusal the defendant has the control of the article so as to be able to comply with the demand; and the burden of proving all this is upon the plaintiff." (quoting De Young v. Frank A. Andrews Co., 100 N.E. 1080, 1080 (Mass. 1913))). Accordingly, these additional facts also do not support a claim for conversion.